I understand that there's some kind of an arrangement that you all have on sharing your time as well. What what do you propose? That's correct, Your Honor. I'm going to be making arguments on behalf of the three agencies. I'm Laura Watson with the Washington State Attorney General's Office. I'm going to try to limit my opening remarks to ten minutes and save three minutes for rebuttal. Okay. And then Jeff Leppo on behalf of the Western States Petroleum Association would like seven minutes. Okay, so please be careful with your time. You know how quickly it goes by. And even though they're not up here right now, do you all have a division of labor as well? Just one of you going to be appearing? Okay, very well. All right, proceed whenever you're ready. May it please the Court. Again, I'm Laura Watson from the Washington State Attorney General's Office and I'll be making argument on behalf of the three agencies. For any one of three reasons, the District Court's decision should be agencies and their regulatory capacities. Second, the reasonably available control technology provision on its face does not mandate that the agencies determine greenhouse gas controls for refineries. And third, state implementation plans cannot extend to criteria pollutants, but even if they could, Washington's does not. Turning to the first issue, citizen suits can be used to address violations of emission standards or limitations. And the key question here is, what does it mean to violate a standard or limit? The Supreme Court in Bennett held that violation does not encompass a regulatory failure of a regulatory agency. But Ben, it's a very different case, isn't it, Counselor? You're talking about something specifically related to the Secretary and you're talking about a discretionary decision. Here, you don't have anything related to, I think that involved the Endangered Species Act. You have a very different situation here with the Clean Air Act. And you're also talking about something that at least under Washington law says, shall. I view Bennett as being quite different. Why am I wrong? Well, I don't want to preface my question by here's why your Honor is wrong, but we. Go ahead. I'm not shy. Bennett, the Bennett Court applied three independent reasons in finding that the citizen suit provision in the Endangered Species Act, which is modeled on the Clean Air Act's provision, doesn't apply to the Secretary of the Interior for discretionary duties. And one of those independent reasons is the equal force for the Clean Air Act. And that is the meaning of the term violation. What the Supreme Court reasoned in Bennett is violations submit the violator to civil and criminal penalties. And certainly Congress could not have intended that Interior, the Secretary or his delegates, would be subject to civil or criminal penalties for their failure to regulate. The Sixth Circuit then in Korleski applied that noting that, again, violations under 7413 of the Clean Air Act subject the violator to civil and criminal penalties. You know, that argument seems to depend on an advert, Shirley. We meet Shirley a lot, but I don't know if she has much to say on that. I mean, there are those of corporations who don't know anything about some fraud low in the ranks to civil and criminal penalties for signing the annual report, a bunch of anodyne statements that they have no idea are false. Why is it inconceivable that some federal official should go to jail? Well, the Supreme Court didn't believe that it was feasible in Bennett for a failure to regulate. But the Korleski Court also noted other ways in which the term violation is used in the Clean Air Act. You don't contend that Korleski is binding on us, do you? No, it's persuasive. What you want us to do is follow the Sixth Circuit and Korleski, right? That's correct. And, in fact, if in fact it isn't a violation, what is it? It is in 7413, a state's failure to enforce the state implementation plan is simply referred to a failure to enforce the state implementation plan. And, in fact, in the same sentence, the term violation is used. And so a state's failure to enforce is explicitly distinguished from a violation. And then in Section 7509, the state's failure to implement a provision of the state implementation plan is referred to as a deficiency, not as a violation. Let me make this, make sure I understand this. If the feds have, as they do, a cooperative federal-state arrangement where the feds approve a state's plan for dealing with air pollutants, the state has a plan that says there shall be no emission of greenhouse gases. The director of the agency says, I know that our statute says that I shall do something to prevent any pollution. I think it's a stupid idea. Why is it inconceivable to subject that director to jail and civil penalties for making that policy decision? Well, because that's not the scheme that Congress set up. The scheme that Congress set up... Why shouldn't it be read that way? It shouldn't be read that way. I mean, frankly, it shouldn't be read that way because that would most likely be inconsistent with the Tenth Amendment. We didn't raise a Tenth a federal regulatory program, and what Congress has done in the implementation of that federal regulatory program is to provide options for EPA if the state refuses to participate in the implementation of that program. But we have a very different thing here, don't we, counsel? Here we have a program where the Clean Air Act says that states can and, or in some cases must, adopt certain guidelines, certain regulations, and then they're submitted to the EPA for approval. And when that's done, then they become federally binding law. In this case, as I understand it, we're dealing with a regulation which was approved by the state of Washington and approved by the EPA. It is a federally enforceable regulation. Now, you were talking about Bennett and the way it was, I'll tell you why I'm confused on this. In that case, the court interpreted the Section 1540G1A of the Endangered Species Act and stated that it was interpreting violation in the context of the entire Endangered Species Act statute. That's a very different statute than the Clean Air Act. I'm puzzled as to why you think we can graft the court's description of, in terms of, in quote, violation in the Endangered Species Act onto the Clean Air Act. Well, it's not, certain provisions of it are not very different from the Clean Air Act. In fact, as I mentioned, the Citizen Suit Provision is modeled on the Clean Air Act Citizen Suit Provision. The section that talks about civil and criminal penalties, except that there are more severe penalties under the Clean Air Act. So again, it's that reasoning that the Bennett court applied in saying, when we interpret the term violation, we need to look, excuse me, we need to look at the statute as a whole. And when we look at the way the term violation is used in other portions of the statute, we conclude that it can't mean a regulatory failure. Are the words substantially similar between the two acts for the Citizen Suit Provision? Yes, very similar. Incidentally, have any circuits post-Bennett rejected Korleski? No courts have rejected Korleski. There is only one court, which was, I think, Southern District of Texas, a case that the Petroleum Association cites to in its briefing that applied Korleski. That's the, and I, like he cited the case yesterday at 1.30. We don't really have to worry so much about our disagreeing or agreeing with our sister circuits when it's a district court case. What I'm really focusing on is, is there another circuit court that has rejected Korleski? There is not. Or that agreed with it. There is not. So basically, there's a vacuum. And the nature of the court is a vacuum. Well, or so I'm told. If I could just very briefly assume my time is running low, unless the court has more questions about the Citizen Suit Provision, I'll move on very quickly to the second issue, which is the interpretation of the Reasonably Available Control Technology Provision. You've got enough time left for Mr. Leppo? Yes. Yeah, I just really wanted to very quickly point out that the key language there is the sentence that states, where current controls are determined to be less than reasonably available control technology or RACT, the agency shall define RACT for each source. And as this court noted in the Gardner case, what you have here is a discretionary predicate where it is determined, followed by a regulatory mandate, the agency shall do X, Y, or Z. But nothing requires the agency to make that discretionary determination in the first instance, and the district court erred in concluding otherwise. What about the shall language? The shall language in the provision. So again, the provision says, where current controls are determined to be less than RACT, the permitting agency shall, as defined in state law, define RACT. So there is a regulatory mandate where the agency has determined that current controls are less. So your view is that if the agency, and I'm not saying it has, but say the agency just has some people in it that say, you know, I don't believe in this greenhouse gas stuff. I'm not going to do anything. But California and other states have concluded, oh, yeah, there is. And we find these things that go, all this technology, electrostatic precipitators, and you can't have cows around the refinery or whatever. And there is the technology. Are you saying that under this regulation that citizens, groups, and courts are impotent to do anything about it? If the agencies have not determined, yeah, they have not determined. So basically, it's a staffing issue of the agencies. If you have people who don't believe in it, then you're just out of luck. Well, it's a staffing issue, but it's also a way in which the agency prioritizes its regulatory responsibilities. And as we know from the Department of Ecology's declaration, and hear from Stuart Clark, the agencies have not decided to pursue reasonably available control technology for greenhouse gases. But isn't that the very point of this regulation? As I understand it, they're required to reach RACT. And all emissions units are required to use RACT where it's available. So the question is, is there any? And I gather your point is they haven't really determined that there is, therefore, they don't have to do anything. Is that your idea? Well, the agencies haven't determined that the refineries are not meeting RACT. And that's because this is not every discretionary tool. You're just saying they haven't taken any action at all. They haven't taken any action, and the agencies would need to make that determination. I mean, for greenhouse... Well, isn't it also true that in the record, the Director of Ecology said, the reason we looked at RACT is that we recognized it as a state law tool available to the agency to address pollutants. But we concluded that RACT would likely not result in meaningful greenhouse gas reductions because RACT is a low bar, and many sources are already meeting or exceeding RACT. That's the evidence. Yes. Yes, that's correct, Your Honor. The agencies did consider, as a function of state law, state law does regulate greenhouse gases, and the agencies rejected... So that is your position, is that they... Not that they haven't done it, but that they have, and they've concluded that greenhouse gases are not... RACT is satisfied, basically, here, right? They've decided not to use the RACT tool. Okay. That's the only evidence I found in the record about what's happened here, and that was from the Director of Ecology's AIR program, correct? That's correct. I'll turn it over to Mr. Levin. Okay, very good. Good morning, Your Honors. I represent the Western States Petroleum Association. I'm intending to reserve two minutes, if there isn't two minutes of my time, and focus for five minutes on the issue of standing. As this Court will appreciate, standing is a complex topic, and not easily addressed in a few minutes, least of all in a difficult area such as greenhouse gas emissions and climate change. Does the new Supreme Court decision on Proposition 8 in California, does its language on standing affect the analysis in this case? I don't believe it does directly, Your Honor. In particular, I think that case went off primarily on injury in fact, and this case is more focused on the issue of causation. So, I'd like to make two quick points, and both of them focus... I thought in your brief it was also remediability. It is also redressability, Your Honor, as well. That's correct. Can I just focus in on it, because we've got so much of the record here. On the issue of causality, in ER 458, 468, and SER 11, 12, and 29, the record seems to show that the five oil refineries here in the state of Washington are the second largest stationary source of greenhouse gases in the state. Is that correct? Do I understand that correctly? Collectively, you're right, exactly. And that the agencies, and I'm using the term collectively here, concur that climate-related impacts in the state caused by greenhouse emissions include coastal flooding, acidification of marine waters, declines in shellfish production, impacts to snowpack and water supplies, agricultural impacts on the east side of the Cascades, and increased forest fires. That's correct, Your Honor. So, basically, you've got the fact that the oil refineries are alleged to be the second largest source in the aggregate, and the agencies have determined that there are these specific concrete results that are occurring as a result of excess greenhouse gases, and you're not disputing that. So, what are you saying are we missing here in causality? Okay, well, so, Your Honor, the fact that they are the second largest stationary source doesn't say anything about their relative contribution. And we know from Massachusetts versus EPA that to establish causation in the greenhouse gas context, and there, in a context in which special solicitude was given to the state of Massachusetts, and so the bar was lowered. But even in that lowered barred situation, the court required a demonstration of a meaningful contribution of greenhouse gas emissions such that it would slow the pace of emissions and moderate climate change. What we have here is two things. One, we have the complete absence of any evidence at the summary judgment stage by the plaintiffs, the Pelley's here, demonstrating that there's a meaningful contribution. And second of all, we have a affirmative unrebutted expert declaration quite to the contrary, and here's what in one place it says, quote, the global climate change effects of the collective emissions of the oil refineries in Washington are scientifically indiscernible given Washington's refinery emissions levels, the uniform distribution of greenhouse gas concentrations globally, in the absence of any meaningful nexus between Washington refinery emissions and global greenhouse gas concentrations now or as projected in the future. That's ER441. Okay, I hear you, I hear you. I guess my question is this, under our Barnum Timber Company case, we found that standing doesn't require that the defendant's actions have to be the sole source of injury. And in National Resource Defense Council, another one of our cases, we say where Congress has expressed the need for specific regulations relating to the environment, that expression supports an inference that there is a causal connection between the lack of those regulations and adverse environmental effects. Any thoughts on that? Absolutely, Your Honor. So first of all, we're not contending that anything contrary to your first point. However, the evidence here demonstrates that there is no causal connection. So... Wait, wait, wait, help me with this. I thought we started off with the point that the refineries are alleged to be the second largest source of greenhouse gases in Washington, okay? Then we have... The second largest stationary source, Your Honor, not the second largest source. Probably cattle are the largest, but let's... Actually, it's transportation is the largest, Your Honor. All right. Anyway, so then you have the issue that there is a specific finding that greenhouse gases do all these things to the water and so on. All right, is it your point that there must be a certain quantum of damage vis-a-vis the whole universe for there to be regulation? In other words, if I... Using a hypothetical, let's say that if you took all of the science together that they would say that one half of one percent of the greenhouse gases emitted from stationary sources come from these refineries. Are you saying that because it's so small that you don't meet the causation requirement? What I'm saying, Your Honor, is that the Supreme Court established a standard that we have to live with, and that standard is meaningful contribution. Okay, and what does that mean? Well, and of course, the Supreme Court didn't leave... Didn't provide that explanation. It simply doesn't. No, in that instance, it was six percent of worldwide emissions, not a percentage of the state of Washington's emissions. And so... So who decides that? Is that our decision? We get to decide what's meaningful? I think, Your Honor, it does, but you have to base it on the evidence. And here we have, A, a lack of evidence whatsoever addressing this issue by the plaintiffs, and B, we have an expert declaration that was presented that demonstrates that it is not a meaningful contribution, because you cannot link this amount. It is so small that it makes... That has no causal connection to the occurrence of greenhouse gases globally or at any specific location, and therefore cannot... So it sounds like your position is that this is a worldwide problem. This is a tiny, tiny fraction of this. We simply cannot deal with this issue unless we somehow get, you know, China and Korea and Indonesia and everybody else involved, because then it wouldn't be meaningful. Is that your position? No. Well, Your Honor, I think that's a policy conversation. No, I agree, but I mean, if you're saying... It's not our position. ...if we have to decide what's meaningful, then we have to decide that within some frame of reference. And I gather your position is, as I used to say in law school, de minimis non curat lex. Is that really your view as to environmental law in connection with greenhouse gases? My view is that the Supreme Court established that the basement on this is meaningful contribution, and in this case, regardless of how we might think about the policies, we have no evidence to demonstrate a meaningful contribution, and we have evidence that is uncontested that demonstrates that it is not a meaningful contribution. And what is that evidence? That evidence is the declaration of Mr. Umenhofer, which is, again, at ER 441 and 442, paragraph 10, also paragraph 12, and also paragraph 13. It's his entire declaration. He's a meteorologist expert and a emissions control expert. And the other side didn't put on anybody from your perspective that would counter that? It did not, Your Honor. And I have exceeded my time. I apologize. I hope Your Honor will allow some rebuttal. We'll see. Thank you. Thank you. Very good. Let's hear from the other side. Please, the court. Good morning. My name is Jeanette Brimmer. With me is Josh Osborne-Klein, and we represent Washington Environmental Council and Sierra Club. We are asking the court to affirm on the merits as we think the district court was well-grounded in its decision on the plain language of the state implementation plan. And in fact, I would like to disagree with our sister circuit, the Sixth Circuit, in order to do that. Your Honor, I think you do have to disagree with the Sixth Circuit. That means there's a circuit split. Right now, there's one circuit that's spoken. Then there would be two, and they'd be speaking in opposite ways. And the Supreme Court would decide whether the Sixth was right or the Ninth was right. Actually, Your Honor, I would disagree with the characterization by the state on that. And I would also like to point out, as we're embarking on the citizenship decision, or excuse me, discussion, that this issue was not raised in the district court. I lost your answer here. Sure. I asked you, would there then be a square conflict between the Sixth Circuit and the Ninth Circuit? And you said you disagree with opposing counsel and something else. I don't remember what, but neither answered my question. Sure. I think that you would disagree with the Sixth Circuit, and that is what we are urging. But there are other circuits that have, indeed, addressed this issue. The Third Circuit has addressed it in detail. There's another circuit with a post-Bennett decision that says whether a citizen's suit may be taken against a state agency? Not post-Bennett, Your Honor. Those did predate Bennett. But I think that Bennett does not apply here. I think Korleski really misinterpreted and misapplied Bennett in this case. Is it true that the citizen suit language in the two statutes is substantially similar? The citizen suit language in the two statutes is substantially similar. But as the court has noted in its questions, the two statutes themselves are substantially different. And their structure is very different. One species, one's heir, right? One is species, one is heir. But the important- We're really talking about whether you can bring a citizen suit, aren't we? We are talking about that. And again, I would note that this was not raised at the district court level. Well, but so what? It's a standing, isn't it? It is not standing, Your Honor. Under the Steele Company decision of the US Supreme Court, Article III standing is a jurisdictional issue. But something that arises under a statute, something like this, under the Clean Air Act citizen suit provision, and in that case it was a citizen suit provision, is in fact decided as a merits issue. And the court decides- That's plainly wrong. The Supreme Court has said that regardless of what Congress says, standing is a constitutional doctrine. And Congress cannot provide it where it does not exist constitutionally. That's correct, Your Honor, standing. But what the court pointed out is citizen suit provisions, a creature of statute. And whether we have a cause of action- Why do you have standing? I don't really understand the causation and redressability arguments. But let me turn to standing because I think that is an important initial consideration for this court. So the causation issue goes to, as Mr. Aleppo pointed out, well, we're just not that much when you talk about global climate change. But that is not the law and it does not fit- Are you saying that any contribution to global warming in the state of Washington must be regulated by the Washington authorities? No, Your Honor, we're not saying- Emission of carbon dioxide? We are not saying any emission of carbon dioxide. We are talking about- What's the line then? We are talking about 6 million metric tons of carbon dioxide by their own emission. A lot or a little without dividing by the amount of emission in the world. Absolutely, Your Honor. So you tell me, carbon dioxide is 0.04% of the atmosphere. There was an arithmetic calculation in the briefs and I can't remember the infinitesimal figure it came to. How much of an increase in carbon dioxide must there be before, in your view, the state of Washington is obligated to do something about it? And is there, in fact, a floor or must they regulate any emissions of carbon dioxide? Your Honor, their own statute provides that they regulate major stationary sources and major sources are defined by the amount of emissions that they have. And these sources have 6 million metric tons. What's major? And that's measured by the amount of their emissions. And let me point out that the state of Washington, by both statute and rule, has set a threshold for greenhouse gas reporting of 10,000 tons. That's commensurate with what the EPA has said. So that line has been drawn. There has been a regulatory decision. So there must be 10,000 tons of carbon dioxide emitted? Before they, and then they have to report. Now we are well, well above that. What's the site on that report again, please? Pardon me? What is the site for the 10,000 metric tons? Sure, the statutory citation is RCW 70.94.151 sub 5 sub a. Would you also like the rules citation? Yeah, please. Sure, that's WAC 173-441-030. I'm having trouble with your standing argument. Not that I can't buy it in the ultimate, but I'm having trouble with two different things. The first is, it seemed to me like Massachusetts versus EPA really gave a special solicitude, if you will, in standing to a state making the determination. I don't see how I can get around that. That's at 549 US at 520. And they said, well, this is the state. It seems to me we have to give a special solicitude. And they got one more vote. So they said there was standing in Massachusetts versus the EPA. Then we went to American Electric Power, which is the next case coming down. There, they couldn't get a vote. It had to be 4-4. They could not say there was standing. The only thing they could decide was, this was state plaintiffs again, because it was Connecticut. But we didn't have any way to decide. Then, if I look at Massachusetts versus the EPA, it was 6% of the global emissions. 6% of the global emissions. If I look at American Electric Power, it's 2.5% of the global man-made carbon dioxide emissions. Now, I look at this case, and I looked at the evidence. I'm not trying to have your case go away. I looked at the evidence. I got no evidence in this record that what you're suggesting has any significant scientific effect on global emission. And your honor, I think that under Massachusetts versus EPA, in this court's case law, for example, the NRDC versus EPA case. I saw the NRDC. I don't think that helps you, so really don't go there. I'm really asking you, please, go where I'm going. Tell me how I'm supposed to differentiate between Massachusetts and American Electric Power. So in the Massachusetts versus EPA case, I think what's important to note is that the court, in giving special solicitude to states, was talking about the injury primarily, not causation. When it moved to causation, it did note the amount. Language that gets you to that point. I didn't find it. That was when they were talking about. That might be a good argument for you to make. But you haven't got one whit of language that says that. When the court is talking about, for example, the damage to Massachusetts shoreline and its obligation under the old cases, the Georgia versus Tennessee copper case, those were the kinds of things. As far as I'm concerned, all that language you're talking about is getting you further through the first prong, which is the first prong is you got some damage out there someplace. I've given you that. I'm on causation here. I'm on regressibility here. And I'm trying to see if you have standing. And I'll be fair. I'm an old DJ. I don't want to get involved in every case that every politician wants to get me involved in, regardless of pro or con or conservative or liberal. I want you to get me to standing. So I'm looking at these cases to see whether I get there. Your Honor. So I looked at these. The only thing I got is that I got a Ninth Circuit decision since these cases. I mean, I got a Ninth Circuit decision about Bayview, which has to do with jurisdiction. But I got nothing else. Let me turn to what the Massachusetts versus EPA court was talking about with respect to causation. Because I think that what is important is the court made very clear that the case law has never been, and the court reiterated that in Massachusetts versus EPA, that we don't have to trace molecule by molecule. We don't do that for water cases. We don't do that for other kinds of air cases. What we do need to show, though, is that there is an actual, and I think we talked about this during Mr. Leppol's argument, meaningful contribution to- I understand, but it seems to me you get to the same place, Counselor. Meaningful contribution. And then I look at those two cases, and I got one bit of evidence in this case, not one whit of scientific difference. And this is a state-based case. This is a state implementation plan. No, it really isn't. It really isn't. The thing about meaningful contribution is telling me what's happening in Washington does not tell me whether there's a meaningful contribution to global warming because of the word global. I am skeptical. I think it's just a mirror image of the same thing that Judge Smith is asking about. I'm skeptical about redressability. I mean, you have an affidavit by somebody who says his ski season is being cut short because the globe is warming. And I know that the district judge in Washington can't do anything about the industrialization of China or India. And even just compared with Chinese greenhouse gas emission, the Washington greenhouse gas emission from these refineries is negligible. I can't see how you can have redressability where there's nothing that a federal district court in Washington could do about these refineries that would affect how long the ski season is for your plaintiff. Your Honor, I think that is a correct observation, that redressability and causation are very closely intertwined. And this court's case law has recognized that. We submit that 6 million metric tons is closely intertwined. You know, you tell me 6 million tons. If you tell me that someone weighs 450 pounds, I know they're on the heavy side because I know what my wife weighs and I know what I weigh. And we're not saying what those are. I carefully avoided that. I was going to say, I was going to say, I hope Judge Kleinfeld doesn't say how much I weigh. If you tell me 40 tons of the carbon dioxide, I have no idea whether that's a lot or a little. Let me give you some perspective on that. Except by having a divisor. If you run that through EPA's carbon equivalent calculator, that's one and a quarter million cars driving annually. That's gives some perspective. 325, 340 million people. But we're talking about the greenhouse gas. I still have no idea what that means in terms of whether it will affect the ski season for your plaintiff. And I think that the Massachusetts versus EPA court has also addressed that and that they have said that. The numbers were way, way higher. They were higher, but I think those concepts that they talked about were very important here. It's just conceptual. I mean, that's like a lawsuit that's about the principle of the thing and not the money. But I think that with the quantity. The court said in Massachusetts versus EPA about how it decides what is meaningful contribution, which is, of course, what this court is going to have to decide, were important and relevant. It addressed the China and India question. It said that doesn't matter. Is there anything that the district court can do that will extend the ski season for your plaintiff? Your Honor, the EPA has confirmed that anything we do, any reduction in emissions, and this is in the Federal Register. That would mean that the district court, if any reduction matters, then the district court should require Washington to prohibit the attorneys in this room from exhaling. Indeed, and I'll leave that case to someone else. But in fact, in this instance, I think that Massachusetts versus EPA does give us some guidance. It said that it doesn't matter what happens elsewhere. And EPA has said reductions now will slow the increase. And the Massachusetts versus EPA court said, that's enough. That's important. These large issues have to be addressed incrementally. That is the only way we are going to get at it. Let's get to the evidence on your side. Counsel for the other side has indicated that there is no evidence that was put on by your side that addressed the meaningful contribution. I mean, you talk about the tonnage and so on. They have the declaration from the doctor, and I've forgotten his name, that basically says this is nothing. It's absolutely nothing. That has no impact. What can you point to in the record from your perspective that shows that if we affirm the district judge's order here, that the meaningful contribution and addressability issues talked about in Massachusetts versus EPA are met? Your Honor, we have the admissions of the state agencies that, in fact, agreeing with the information that we put in from the University of Washington Climate Impacts Group. And where is that in the record, please? Is that about what Washington does? Because I think there are a lot about what Washington does. But again, given the evidence, and that's what I looked at here, because I'm not sure I'm not with you, but I'm trying to find some evidence to help you. There's nothing about what it will do globally. We got a lot about Washington, but we got nothing. All I got is that one affidavit he rubbed in my face of indigo. But I think, Your Honor, we're not talking about what we need to address globally. And in fact, with that affidavit, he is, in fact, submitting to the court that we're never going to get to climate change, that it's not going to be addressed,  I don't really see why that's a problem. It is true that because of the problems of causation and remediability, you may never get a case that would satisfy the standard urge by Mr. Aleppo, where a district court can issue an injunction. However, doing something about these various sources of emission would make the world poorer. I don't mean poor metaphorically. I mean less money, less wealth. And poverty causes its own harms to humans. Perhaps global warming causes harms to human, and perhaps increases in carbon dioxide contribute to it. We know for sure that poverty does. So why shouldn't it be a policy question decided congressionally, rather than an inch by inch incremental series of injunctions by district courts, each of which has no practical effect, but which, in your theory, incrementally would add up to some practical effect? I think that might apply, Your Honor. If we were asking this court to do something, I might describe it as more amorphous in terms of the relief that my clients are entitled to. But in fact, Anything you do about refineries is going to make people poorer. Either it costs them more, or they quit refining oil there. And either way, people's cost of fuel is increased. Actually, Your Honor, the evidence in this case is that what the refineries can do for reasonably available control technology are efficiency measures, which will, in fact, save the refineries money. They are going to be more efficient in their operation. They will, in turn, need less fuel. And that's after the initial investment. That's actually what the evidence demonstrates. But the critical words of your remark are after the initial investment. I mean, it costs money. And if it's going to be a matter of spending a certain amount of money to have a certain amount of effect, and any particular location has no practical effect, then it may be that a standard where courts can't do anything about it, and it's left to Congress, may mean that maybe fine. I mean, people get to decide whether to vote themselves poorer but cleaner. But I think, Your Honor, that's not what the Supreme Court has said about standing. I don't think that the Supreme Court has said, just because an environmental problem is large or complex or has many contributors to it, that we are not going to find standing. Large, complex, and multiple contributors is different. The two plumes of pollutants, neither of which adds up to a lot, but together they do. That's very different from something that's global, where the air in Washington may be much more affected by what happens in China than what happens in Washington. I submit that it's not that different, though, from, for example, the NRDC versus EPA case, where there was a failure to do a stormwater regulation. Many, many sources of stormwater throughout the area that were contributing to that problem. And this circuit had no problem. The stormwater cases are not global either. If I could, I'd like to change. It's actually been reversed. If I could, I'd like to change the emphasis, because I was worried about this, where current controls are determined to be less than the RACT. It seems to me where current controls are determined to be less than the RACT, that that's a conditional rule. And if it's a conditional rule, I'm having trouble seeing why the federal court gets involved. I have trouble seeing how the district court got involved. I have trouble why I should get involved. And yet, I read all over to find out what your response to that argument was, and I found nothing. What is your response? Our response to that argument is in the briefs, Your Honor. And in fact, my colleague omitted an important provision in the state implementation plan in discussing that. In fact, if you were to accept her reading that the state has to make a determination first, and oops, it didn't make a determination, so we have no obligation. First of all, that's very circular, as the district court recognized in its ruling. But second, that has to be made. Well, I don't know whether the district court really found it was circular. I read her decision. But my worry is that I have to determine whether current controls are deemed to be less. And I have to determine whether that's conditional or whether it isn't. And if it's conditional, it seems to me that the law requires me not to get involved. Because, I mean, OK, I'm from Idaho. The Idaho people would do one thing with their rules and regulations and fight the EPA tooth and toenail against their liberal interpretations, quote unquote. I go to California, because I'm now on the Ninth Circuit. And they wanted the EPA to get more liberal, and so they fight. So we have to have, and I think Judge Smith wrote a real good opinion about that. We have to have something where the government makes the determinations as long as they follow the rules. We don't get involved. Well, I read the RACT, where current controls are determined to be less than the RACT. And I read it in perspective to the RACT and the plain language. And I'm still having trouble why we get involved. Because they've never determined it. In fact, the evidence is they determined just the opposite. The plain language, though, also includes an obligation. It says when it's determined not in compliance with the RACT in accordance with RCW 7094-154, that statute, which is incorporated by reference into the plain language of the state implementation plan, requires the state to, on a five-year basis, review and determine RACT and make a list. So if we interpret it in the manner that the state would have you do, then we are reading an entire provision out of the state implementation plan. The case law is plain that we do not do that. You interpret a state implementation plan within its four corners. And you do not leave part of it behind, because the state has chosen not to do that. The state admitted it's never done RACT. In fact, not just for greenhouse gases, for anything. It's made one RACT determination since 1995 for one industry. It just hasn't done it. And that is not the way that state implementation plans are interpreted and applied. Let's just say, Arguendo, that I agree with that point. But I'm still troubled by the de minimis issue here. What's the best language that you have from the Supreme Court that tells us that even though the contribution of the five Washington refineries is truly de minimis on a worldwide basis, that we still have a meaningful contribution and redressability? The best language from Massachusetts v. EPA. From anywhere, if that's the best case. I would submit that we have guidance from Massachusetts v. EPA. That's the best one, because the other one didn't talk about standing and couldn't get enough judges together. Not at the Supreme Court level, that's right. And what language would you cite there? I would cite, Your Honor, to the, in particular, I'm looking at page 524 of Massachusetts v. EPA, which got to the redressability point, but also talked about the fact that China and India will overtake us does not mean that we don't have causation, we don't have redressability. And I will quote, in fact, from Massachusetts v. EPA. In that case, they said that EPA was making an erroneous assumption that a small incremental step, just because it is incremental, can never be attacked in a judicial forum. Accepting that premise would do most challenges to regulatory action in the environmental context. And I think that the court was really capturing the same concept that we have here. Thank you. Any other questions from my colleagues? This is obviously something we could discuss for a long time, but we thank you. We'll give you a brief couple of minutes to respond, if you'd like. Again, we're never going to cover it all, but are there any particular points that you'd like to make in rebuttal? Yes, Your Honor, thank you. Just very quickly, the question was whether the Bennett decision has ever been applied to other Clean Air Act cases, and both counsels answered that question no. I did want to point out, though, that Bennett has been applied to other citizen suit provisions. First, the Second Circuit applied it to the Toxic Substances Control Act in the Physician's Commission for Responsible Medicine case, cited too in our brief. And the Second Circuit also applied it to CERCLA's citizen suit provision, and that's in the Bensman v. Whitman case. That's cited in our brief. Plaintiffs have had no response to those two cases. The other thing I wanted to point out related to the statute, the RACT statute, that the plaintiffs referenced, it has not been made part of the state implementation plan, but we also emphasize the statute to point out the breadth of the district court's error in this case. That statute, 7094.154, gives the state exclusive authority to determine a RACT list and schedule, which the state has done. Now, the plaintiffs aren't arguing that the state hasn't followed what it needed to follow under the statute. What they're arguing is the state is required to prioritize greenhouse gases from refineries to put that at the top of the list, even though there is no language in either the RACT provision that is in the state plan or in the statute itself that would allow the court to substitute its judgment for that of the state and determine which sources get priority and which air contaminants should be considered. As I recall, Judge Peckman's order actually didn't limit it to greenhouse gases. It talked about allowing the agencies to make their own determination of what emissions were should have priority. Is that a correct statement? That's correct, Your Honor, but the court's order does make it clear that greenhouse gases have to be one of the contaminants that are considered. And the statute, again, in giving the state exclusive authority, it's those contaminants that are deemed to be of concern. Here, the court stepped in, deemed greenhouse gases to be of concern, and ordered the agencies to make RACT determinations. So under your interpretation, if the agencies determined that SOX and NOX were a far greater problem, they could prioritize those and not reach greenhouse emissions and still be in compliance with the law. That's correct. And as I understand it, on a list that's already been developed, neither the refineries nor GHG are at the top of the list. That's correct. All right. Thank you all for your arguments. Very helpful. Very complex, difficult issue. The case to start is submitted, and the court is in recess for the day.
judges: Kleinfeld, Smith, Smith